We'll hear first from counsel for the government, Ms. Davidson. Good afternoon to you. Welcome back to the court. I understand that you intend to speak for five minutes and reserve ten minutes for rebuttal. Yes, Your Honor. And may it please the court, I am going to reserve most of my time to address the question whether the trial court's judgment that the government of Canada lacks standing should be affirmed. And I'd like to just take a few minutes now to highlight two reasons why the trial court's judgment that the Canadian producers' possessed standing should be reversed. First, this is the only case in which we are aware in which a trial court has found standing based solely upon an economic theory. The Canadian producers, even though their standing was challenged, declined to present any factual evidence whatsoever to support their claims of injury in fact. They relied solely upon an economic expert who admitted that he had gathered... I don't know if you mean factual evidence. They had witnesses. There were four witnesses, as I recall. Testimony is evidence. If it's relevant and persuasive, it's sufficient to carry the day on most points. So I don't know what you mean when you say it's not factual evidence, it's non-factual evidence or whatever the alternative is. It was solely an economic theory. They present only an economic expert. Their tax and their competitors are given the rewards of that tax. I mean, help me out. Why isn't that a pretty clear injury? Well, this case illustrates why it isn't a clear injury. For example, in this case, as the judge noted, the only U.S. industry that is still in the case, the North Dakota Wheat Commission, sometimes uses funds and did in this case for university research that benefits the industry on both sides of the border. Another way a firm might use the distributions is to wind up a business that has failed because it takes a lot of money to close down a business. I thought the commission witness also said that they did work to promote North Dakota wheat and that as a result of that work, the sales in certain export markets of North Dakota wheat had increased and the sales in those same markets of the Canadian wheat had decreased. That was in the past. If you look at what the trial court admitted, and that sort of leads over into the second point I was going to make, but the first point I wanted to make is that the trial court only relied, and the Canadian producers only presented economic theory. It's not just theory. When somebody testifies that sales changed, Canada sales went down, North Dakota sales went up because wheat promoted North Dakota sales. That's exactly the kind of evidence they did not present. That was the testimony of the witness of the commission. That that is an activity of the North Dakota Wheat Commission, is to promote sales. There's no evidence that the receipt of $127,000 in distribution, which is all the North Dakota Wheat Commission received, was ever used for that purpose. Part of the reason they didn't use it was because they put it in a reserve account waiting for this litigation to end so that they could then use it for whatever it is they wanted to use it for because they were worried that they might have to cough it back up. Well, when and if injury becomes actual or imminent, perhaps... How about inevitable as opposed to imminent? If economic injury is, as a practical matter, likely or perhaps even inevitable, why isn't that sufficient? Well, it's not inevitable. As this case shows... How about likely? Excuse me? Stick with likely for the moment. Okay, even likely, although the Supreme Court, of course, says concrete and particularized, meaning... I don't find any of those adjectives at all helpful. Okay, let me just clarify one point then. As of last week, the Canadian lumber industry and the Canadian magnesium industry admitted that their claims are moot, that they cannot... We're only asking you about wheat. We're trying to cooperate here with you on the main issue. This is why it's not likely or inevitable. The trial court report was primarily influenced by the fact that, at that time, the U.S. government was holding $4.5 billion in deposits based upon Canadian lumber. But the trial court made specific findings about wheat per se. Not really. Separate from steel and magnesium and all these other products. But the trial court said that... Does it really matter whether it's magnesium or wheat or lumber, or does it matter only that there'd be one plaintiff withstanding who's entitled to challenge the way in which the government is allocating that money? Well, there has to be at least one plaintiff, and there is no plaintiff here, because the trial court admitted that the situation with wheat was very tenuous, and the most the trial court could say was, it is unlikely that the money will not in any way alter the conditions of competition. But it could make no findings, and the Canadian producers presented no evidence whatsoever that the North Dakota Wheat Commission was going to use the bird distribution in a way that would harm Canadian competitors. So there's no evidence in the record. Why did we lose this at the WTO? Why is the bird repealed now? Because it caused economic harm. Well, actually, no, the WTO did not conclude that the bird distributions were a subsidy. It rejected that claim. What it did conclude was that this was a measure that was not authorized by the WTO to redress anti-dumping and dumping and subsidization. So that particular claim, that this is a subsidy, was rejected by the WTO. Can you help identify what pot of money we're fighting over here with respect just to wheat? Yes. As I understand it, imports come in, the duties are collected, they first go into one kind of account, and then later they go into a second kind of account. Only when they're in the second kind of account, within the time periods that are relevant, can they end up being distributed to, in this case, the North Dakota Wheat Commission. Is there actually any money in the account that, if it weren't enjoined or the victim of a declaratory judgment here, the department would be able to hand over to the North Dakota Wheat Commission? How much money is in that account? Yes. The answer to that question is a maximum of $180,000. So the North Dakota Wheat Commission received $127,000, could receive a maximum of $180,000 additional, which has not been distributed for the next year, which is the only year remaining before the order was revoked. The North Dakota Wheat Commission did not seek funds. They have to submit an annual request, a certification of legitimate expenses incurred that can be reimbursed for the funds, and the North Dakota Wheat Commission did not seek any additional funds. So the maximum it could ever receive is $300,000, which is delivered by two tractors. So what? I mean, I don't know anything in the law that says there's a floor amount that if the stake isn't X million dollars, nobody has any legal right. The Supreme Court has been very clear that there has to be a concrete, particularized showing of injury to the plaintiff. $100,000 isn't an injury? You've been with the government too long. I thought she was getting out of court. Go ahead. Well, I anticipated that all three of you would ask me a question you haven't asked me, but they don't want to answer it then. Do you want to know what would constitute injury in fact? No. Okay. I guess it wasn't something. All right. Mr. Rosenthal, you're next up. Thank you, Your Honor. I want to lead with an answer to Judge Rader, because it is absolutely wrong that the WTO made any finding with respect to injury or competitive harm as a result of this burden amendment. And it's also wrong to presume, as the lower court did, that the granting of money as subsidy. But they found it was a specific action against dumping that was not taken in accordance with GAAP. Right. It was violative of trade principles. It was not a fair trade action. Our government had to repeal it because it was harming people. No, not because it was harming. They did not make a finding. Because it was out of accordance with fair trade principles of GAAP. No, not because it's out of accordance with fair trade principles either. What the WTO said was that you're only authorized to take certain measures under the GAAP. The WTO found the burden amendment distribution were injurious to importers. That is not what they said. The WTO said that you, as a government who is abiding by the GAAP principles or by the GAAP code on dumping, may only take certain measures. You are not authorized to do anything else beyond that. When the question arose, is this a subsidy that is actionable, the WTO said, no, it's not. And we're not here for that. Well, the district court didn't make any judgments on that anyway, provided it was background information and went on to decide it on sound principles of U.S. law. Sorry, that analysis infected the district court's entire opinion. Because it presumed, and the language in the district court's opinion says, the subsidy is tantamount to imposing another tariff. Whereas, I want to bring this court's attention to the only case you've decided thus far that actually addresses this issue. That's the Huion case from 2003. Well, how about helping us with standing? We had to tangle here on standing. The clock is running, and I don't think we're making any progress on standing. Well, I'm a part of it. Do you agree that there's no longer standing with respect to lumber and magnesium? Yes. So is it the case, then, that everybody agrees that we're only talking about wheat? I believe that's true, yes, sir. Okay. And so your view is that the trial court was wrong about standing with respect to wheat because of what? Because just because you grant a subsidy to one party doesn't mean that the other party is interested. That is true in economic theory and otherwise. I could grant a subsidy to this court and say, you may get $100,000, and you can buy— Well, the trial court found, I believe it's fair to say, that it was likely that if distributed to the North Dakota Wheat Commission, that the money would be used in such a way as to harm the Canadian Wheat Farmers Association. Actually, the trial court had a couple of double negatives. I'm restating. Okay. But it said that— Now, is your view that likelihood doesn't cut it? That, yes, there is a likelihood, but that doesn't meet what the law requires? Or is your view that, as a matter of fact, there's no likelihood, or what? I agree that likelihood does cut it, but there's no factual basis for a determination of likelihood in the court's opinion. How much fact is necessary? Is it necessary that somebody have empirical data that certain prices went up or certain values went down? Or is it sufficient that there is a consequence, a logical consequence, to certain conduct that will bring about certain sort of results? For example, we have, I believe, something called countervailing duties, which is based on the assumption, if I'm not mistaken, that when a foreign government subsidizes its foreign industry, that that's unfair. There's no proof necessary, is there? Yes, there is. And that's the entire point. Under U.S. countervailing duties law, and throughout GAAP, it is not enough to say that the foreign government has subsidized the foreign industry. There has to be a showing of injury as a result of that. And if you go to the IPC, and you've reviewed a lot of their cases, it does not have to show a lost sale or some decline in prices. But the IPC says, we want to see some more evidence of that. We don't want to see economic theory that somehow you may—your competitor may benefit by the subsidy. We want to show that your prices have declined, your volumes have gone down. There has to be something more in theory. Well, what about the testimony of the North Dakota Wheat Commission witness that foreign sales in certain markets of Canadian wheat had gone down, and that the loss of market share by the Canadian wheat farmers was gained by the North Dakota farmers? That there was no connection with those figures and any distribution of the burden. Well, it's true that he was talking about something in the past, not something that arguably was about to happen in the future. But that doesn't necessarily make it irrelevant. I mean, if that were true—I didn't see it was contradicted by any witness— if it were true that Canadian wheat growers lost foreign market share, and that the loss was correspondingly reflected as a gain on behalf of the North Dakota wheat producers, then that looks like harm to me. There is no connection, whatever wishful thinking might have been there by Mr. Fisher or the judge, no connection between the loss of market share and $128,000 that was granted to the wheat commission that was never spent. If you go back to your— Yes, if they're in the business of promoting North Dakota wheat, presumably since it's a competitive global market, they have to say something generally to the effect that North Dakota wheat is better than anybody else's wheat. Therefore, you people in Korea or wherever it is, buy North Dakota wheat. Don't buy wheat from Australia, Canada, or anywhere else. If that's what they're going to do with part of the $127,000, then how does it not harm Canadian wheat farmers? There are any number of uses of that money. They could have gone out and put up— That's not the business they're in. The business they're in includes promoting North Dakota wheat to be sold to more buyers in contrast— distinction from anybody else's wheat. I understand that, but— The fact that they might also do some research that would benefit anybody doesn't prove that there won't be some harm. It just means the harm will be less than if all the money was spent on promotion. Well, it could have been that all the money was going to be spent on research. The testimony below doesn't indicate that, and that's the problem. Well, the testimony indicates that one of the main missions of the commission is to promote North Dakota wheat. Isn't that fair to say? Your Honor, it is one— Maybe it's not their only thing, but it's one of their things, and it's one of their main things, and they do a lot of it. But it's not evidence of injury, and it's not evidence of any competitive harm to the Canadians. It's certainly not going to be a competitive help to the Canadians. Well, you don't know what the uses were. Well, we know what they were in the text. In the case of the wheat board, what should we do? Wait until after this litigation is terminated, presumably in your favor, and everything becomes race judicata, and then watch to see if they actually take that money and use it in a competitive manner? Well, here's— That doesn't— Are you comfortable with that? To truly understand the impact of the Berg Amendment, I just want to refer you to two sentences in one of your cases because a subsidy does not equal injury—doesn't equal competitive harm. This court recognized that in the Huion case. What it said here is that the anti-dumping duties assessed under the current selection regime are identical to those assessed prior to the implementation of the Berg Amendment, remaining proportional to the harm caused by dumping. The Berg Amendment actually enhances its remedial nature. The duties now bear less resemblance to the fine payable to the government and look more like compensation to victims of anti-competitive behaviors. Now, step back and think of this as you did as a payment to a victim. If I pay you more money as a victim, does that enhance the perpetrator at all? Does that burden the perpetrator at all? It depends. It depends. If they're in direct, serious competition, it seems to me it very likely will help the Canadian competitors. If they're not competitors, it won't. Number one, there isn't evidence that what we're talking about here is economic theory and not actual evidence of harm. That's number one. Number two, and I know you want to stand with me, but I want to have a few minutes. I want to get to the merits here. If Congress recognized, as this Court did, that a victim's compensation payment is not a burden on the goods and not the same as a tariff, contrary to the mistaken view of the Court below, then there is no obligation under Section 408 to do anything special in the way of magic words to mention that, oh yes, we also want to make sure that the victims of dumping by Canadian and Mexican cruisers also get benefited by this program. Could I ask you to respond to one of Judge Polk's points? He says the defendants are the only ones who really will control these funds, and so they'll be the ones who have any evidence as to the way harm will happen, and they can control that harm. So I have to presume that there's a likelihood of injury, particularly when they're direct competitors. I think I've just paraphrased page 20 here. Can you respond to that? You control kind of how you're going to take their profits and use them, and so he says he's afraid you could manipulate that in ways that would make it difficult for them to show specific harm, so likelihood's going to be enough. Characterization of his view. Our point there is that we understand his view on likelihood in terms of economic theory, but until there's some actual evidence of harm, it's too early to come in and argue that you have standards. And indeed, I go back, and you'll be hearing a little bit about this from Mr. Gerrish when he talks about the statutory bar issue, but the whole theme here, and this is somewhat frustrating looking at the lower court decision below, where I could argue that he lost, the judge confused the forest with the lumber, and that was really driving his concern. We had a pre-trade agreement which essentially says the U.S. and Canada and Mexico can retain the use of the Campbell-Ellen meeting and dumping lots. No dispute there. But if you're going to do something to change those laws that will affect our goods, we want to be notified. And if we're notified, we want to have a chance to consult with you and maybe even have a dispute settlement panel under NAFTA with you. But the Congress did not contemplate, no matter what the harm was, if we poured, if we poured, members can go out and get two tractors, the Congress did not contemplate that you're going to be allowed to sue because we're going to, seven years later, give money to victims of unfair trade and thereby undermine the remedial purposes of the law. Are you on standing or merit? They're all related. They are related, but I'm slow, so tell me what box we're in. The box is twofold. There's really no right to sue. We're on statutory bar. And if you have a right to sue, it's not for this. And it can't be because you have a de minimis amount of money that's deposited in your account that someday might be used to hurt me or hurt you at the tune of $180,000 or $300,000. That cannot be the statutory scheme. All right, we've given you some extra time. I think we'd better hear now from Mr. Rosenthal. Oh, pardon me, Mr. Garish. Sorry about the confusion. Welcome to the melee. Can you help us? Good afternoon, Your Honor. May it please the Court. I'm Jeffrey Garish, a stand-in attorney at the U.S. D.O. Mr. Rosenthal just referenced the statutory bar issue, which I would like to address here this afternoon. The fact is here that the plaintiff's action is barred by Section 102C of the NAFTA Implementation Act and shouldn't be dismissed. How can that be? But that talks about an agreement. That's about the NAFTA agreement itself. The agreement's not the act. Now, in fact, the statute itself, Section 102C, bars causes of action under the agreement or, this is the key word, by virtue of congressional approval. Thereof. Thereof meaning of the agreement. Exactly. Well, yes. So the way I read that is no cause of action can be based on Section 101 of the implementing legislation because that constitutes the approval of the agreement. But Section 103, 104, 105, and the whole rest of the act, different story. Well, and, in fact, that is what Judge Pogue found. What's wrong with that?  First of all, it would be really, I think it's hard to expect that Congress would have approved the implementing legislation in a provision of the implementing legislation itself. It just wouldn't make sense for them to have done that. They are enacting the implementing legislation. They don't need to approve the implementing legislation. No, they're not approving the legislation. They're approving the agreement in the first section, and then they're implementing the agreement by changing domestic law in all the other sections. In fact, the fast-track concept was to merge both the approval of the treaty and its implementation in one document. And that's clearly what they were doing. And this section clearly applies to that first step, doesn't it? Well, it does, Your Honor. The fast-track mechanism does merge legislative approval with the implementing legislation, and that's the very point. This language, by virtue of congressional approval thereof, because the two are merged, must encompass the implementing legislation. There is no distinction. I don't see how that follows. I don't follow you at all that it must encompass the entire rest of the statute. The changes to domestic law have nothing to do with approving international agreements. Well, the fast-track mechanism eliminates this distinction between approval and the implementing legislation itself. No, it doesn't. No, it doesn't. It just says you do it in one vehicle. It doesn't say the two things are one and the same. You just put them in the same package. What's so complicated about that? In fact, the reason behind fast-track there was to do assurances to our foreign trading partners. That's not going to help. Well, it goes to show why the two are one and the same. In fact, in the legislative history for both the predecessor to 102C in the Canadian Free Trade Agreement and in the current NAFTA Implementation Act show that Congress did intend for this language, by virtue of congressional approval thereof, to include the implementing legislation. They originally adopted section 102C in the Canadian Free Trade Agreement Implementation Act. Congress made clear its intent to preclude cause of action for the people therewith. You're arguing based on a different statute than the statute that's before us. How is that helpful? It's the precursor to the NAFTA Implementation Act. And the NAFTA Implementation Act then built on these exceptions that were recognized by Congress to the statutory borrow. With the Canadian Free Trade Agreement Implementation Act, Congress recognized just one exception to the statutory borrow. And that was a constitutional challenge to the binational panel dispute settlement process. So by recognizing explicitly just this one exception to the statutory borrow, Congress necessarily approved the general rule. And that is that all other causes of action under the Implementation Act were borrowed by section 102C. Well, what sense would that make? If the Congress to implement an international agreement is going to make a thousand changes in domestic law, why would it be sensible for the Congress to intend that there can be no enforcement of any of those changes in domestic law? There certainly was enforcement of all those domestic laws before they were changed. So when they're altered, why do they suddenly become outside enforcement in the courts? It doesn't seem logical to me. Well, there are two things I'd add here. First of all, this particular provision was not present in U.S. law before the Canadian Free Trade Agreement Implementation Act. But second, there is judicial review available if there is another statute that specifically provides for judicial review of a cause of action. And that certainly was recognized in the TINPAN MSK cases where there was a specific provision allowing for judicial review separate in part from the Implementation Act. Here, the plaintiff's action is under the ATA. It is therefore dependent on the underlying statute that they are seeking to enforce, which is section 408 of the NAFTA Implementation Act. It does arise exclusively by virtue of the Implementation Act. These other types of actions would not arise by virtue of the Implementation Act. They would not be precluded by 1.02c. Well, it seems like it creates a very illogical distinction between certain trade laws and certain other trade laws, some of which will continue to be enforceable in the courts and some of which won't. That doesn't make any sense to me, but apparently makes sense to some people. These are rights between sovereigns, as well, Your Honor. And there was a dispute settlement provision in the NAFTA itself that allows for that. We're not dealing with that. No, I understand, Your Honor, but there was a mechanism available to challenge any changes that were made that didn't comply with this or allegedly comply with this provision. We're concerned, for the most part, until we get to Mr. Phillips, with the impact on private parties. We're not talking about a fight between two sovereigns here. That's correct, Your Honor. And this specific provision was intended to preclude private parties. And, in fact, it's been interpreted as such, or at least the virtual identical language in other statutory bars has been interpreted as such by other courts. And Congress has acquiesced in that. There have been two decisions which have been acquiesced in that. You've exceeded your time. We've given you some extra time. We'd better hear from the other side now, or we're never going to get to an end here. Mr. Phillips. Before I bring the materials up, Your Honor, I wonder, since I'm representing the government of Canada and my colleague is representing the private interest, and since most of the focus has been on the standing of the private interest, would you prefer to hear from him first? Because I'm going to shift focus to Canada's standing. It might be more sensible in the scheme of things, given the way the argument is going on. It's up to you. I think that's probably a good suggestion. We'll accept your suggestion. We'll hear from your colleague first and then you. But with the same allocation of time. First time I've ever seen a lawyer decline to argue. He didn't decline. He deferred. All right. So we're still on private party standing for the most part. Yes. Good afternoon. Welcome. And please help us out. Thank you, Your Honor. And may it please the Court, I'm Matthew Yost. I'm here today on behalf of the Canadian Law Court. I'm not going to make the suggestion that a counsel before you earlier this afternoon made, which is that this case is easy. I'm not going to begin with that proposition. However, I think it is a fairly straightforward proposition as a matter of economics and as a matter of fact. Now, which piece of it are you going to address first? With respect to the producer plaintiff's standing, Your Honor. Standing. Yes, that's right. My comments are really important. At some point, I hope somebody will get to the merits of the case, but sooner or later. Absolutely. With respect to the standing of the producer plaintiffs, when the government takes duties that you pay on your exports to the United States and hands them out dollar for dollar to your direct competitors in the marketplace. But what if your competitors then took them and contributed them to some worldwide weed improvement board that benefited you just as much as them? Would that be a hypothetical, not necessarily this case, that would not have specific harm? Judge Rader, the standard is what is probable or likely. Yes, I understand that. With respect to the competitor's standing cases, is economic injury probable or likely? I understand. In this case, the court took extensive evidence from witnesses and established that, in fact, the North Dakota Weed Commission was likely to spend at least some portion of these monies in exactly the way that it had spent the monies in the past. Namely, to promote North Dakota wheat relative to Canadian wheat in various export markets. That was a factual finding of the lower court that had a basis in the testimony of the North Dakota Weed Commission's own witness. So that was the issue. Is it probable or likely that the North Dakota Weed Commission will spend so much money... Are we allowed to guess? I'm sorry? Are we allowed to just guess whether competitive harm is probable or not? I'm not sure what you mean by guess, but in fact... Speculate. Speculate. Well, if you look at many, many competitor's standing cases that we cite in our brief and that the lower court relied upon, in fact, they take for granted, they assume the economic principles that Judge Cone fathered to hear expert evidence on in this case. Many competitor's standing cases are based on just basic economic understanding that when the government takes some action to benefit your competitors, it's a bad thing. Well, you know, it's so attenuated here. I understand that the North Dakota Weed Commission doesn't even grow wheat. It doesn't produce one bushel of wheat. It works on the side with promotion and research and other things. It's going to get a little bit of money. It starts to sound very attenuated that a group of Canadian wheat growers are going to suffer some kind of quantifiable dollar harm if the North Dakota Weed Commission produces more cartoons that encourage children to eat bread, some of the things that they do as a part of their promotional activities. So it starts to get pretty stretched out, pretty attenuated. Well, Your Honor, as you were observing earlier, the court made a specific factional finding, which I'll draw your attention to. What page? This would be page 56 of the split opinion of the lower court. The North Dakota Weed Commission representative testified that its promotional activities, they quote, helped to take back market share from Canadian wheat in specific export markets. What were they? I'm sorry. What were those specific export markets? What share was taken back? I don't think the testimony before the lower court speaks to that question. It certainly didn't. So the record is devoid of any specific evidence. We have a conclusory statement of one witness on cross-examination where the whole content of the answer is in the question, and the witness essentially says yes. So that's about as thin a proof of dollar harm as I can imagine is totally nonspecific. Your question, Your Honor, raises the same issue that I was going to address with respect to Ms. Davidson's argument to Mr. Roosevelt. Namely, no matter how you interpret what they're saying, their conclusion is that you have to wait and see how the North Dakota Weed Commission actually spends the money before you can begin to evaluate whether there was a sufficient basis for standing in this case. I'm not necessarily suggesting that their argument is right, but what I'm wondering is whether you carry the burden of affirmatively proving harm where all you have is one sentence by one witness that's totally nonspecific, and it talks about unspecified export markets. No numbers, no percentages, no countries, no locations, no years, no dollar values, nothing. Just a bald conclusion. If that were offered by an expert witness, it would be excluded as having no foundation. Again, I would point, Your Honor, to 30 or 40 years of competitive standing jurisprudence in which I am not aware of a single- I don't think that helps us at all. That has required the level of quantification that you are suggesting. No, I'm not suggesting any level of quantification. I'm just asking if a total non-quantitative answer is sufficient to carry the burden. I'm not sure if it is a non-quantitative answer. Ms. Davidson derives this as based solely on economic theory. Well, yes, in the sense that when you give subsidies to your direct competitors, it's a bad thing, and bad things follow from that. You need to editorialize. The Congress has already taken care of all the policy here. We're just trying to apply some case law to the facts of this case, and the proof here looks very thin. Shifting just slightly, but only slightly, there's no private cause of action anywhere authorized, is there, in the statutes? Are you referring to the cause of action in this case? Of course, the cause of action in this case arose under the APA, Your Honor. I'm not sure what you're- But there's nothing specific in these statutes creating a private cause of action, is there? A private cause of action- Independent of the APA. Independent of the APA, yes, in these statutes. But I think it's uncontested in this case that the APA provided a sufficient cause of action for the Canadian producers to litigate this issue before the lower court. Well, it maybe depends on how we interpret 408. If we interpret 408 as suggested by Mr. Rosenthal, then the answer is no. 702 is not good enough by itself. Well, as this court has recognized in cases such as Cheyenne, for example, the APA creates a cause of action to contest actions taken by customs in the administration of the trade laws. And our view is that's precisely what this type of case was. So it's unclear to me why there's any question as to the absence of a cause of action in this case, if that is indeed what the court is suggesting. Let me return to the factual question that you were raising before concerning the injuries of the producer plaintiffs. I think it's important to recognize, as I'm certain the court is aware, that the lower court's finding or standing was based on certain factual determinations. Those factual determinations are reviewed for clear error. And it's quite clear on the basis of Judge Pogue's opinion that he, as he puts it, he weighed the competing explanations offered by the parties after two days of testimony and made certain findings. You're suggesting that there's a difference between the deference we give to Judge Pogue and the deference we would give to an administrative agency case in which we would seek substantial evidence in the record. You're suggesting, I take it, that our job is not to look for substantial evidence in the record but just to determine whether the trial judge clearly erred in his conclusions of fact or factual conclusions. Which one? Well, I think specifically, Your Honor, the standard with respect to factual findings by the lower court when it is making its own independent standing determination. We're not talking here about the view of an agency determination. I understand. But clearly, when the court makes factual findings to support a finding of standing, those factual findings are reviewed for clear error, as are administrative findings. So what? Well, my point— It doesn't mean he can't be wrong. It just means we have to defer to a certain degree. Okay, we'll defer to the required degree. But it still goes back to whether this testimony amounts to anything to prove specific harm. Well, but my point was that the specific factual finding that the lower court made specifically with respect to Wheat was that it is unlikely that the money distributed to the North Dakota Wheat Commission will not in any way alter the conditions of competition. It comes down to this statement, doesn't it? It is apparent that plaintiff's sales may be diverted to a competitor that is better able to compete as a result of the Byrd Amendment distributions. Is that, may, a tentative finding, or is that a likelihood finding? Your Honor, I think it's a finding that comports perfectly with the relevant legal standards here, under competitor standing principles. Is there probable or likely economic injury to the plaintiffs resulting from these unlawful government actions? The findings of the lower court are directly in support of that finding. Is it the case that the injury could be potential rather than real? It can be in the future, yes. It does not have to have materialized yet. In fact, that's exactly the problem with the appellant's argument here, is that they have this wait-and-see attitude about how courts should approach the question of injury in fact. It seems to me that's a critical distinction between you all because, as I understand their argument, they want evidence of actual competitive harm. And your answer is, we don't need that. All we need to show is that there is a potential for future harm if this process, if the money goes where it should. That's right. As I was saying earlier, I can give you 20 or 30 citations for the proposition. You did. We have to wait until the harm materializes. So then the question comes up, how likely is that potential harm? That's right. And that was basically the factual question before the lower court. And that is the purpose for which it took two days of testimony, including hearing for two extra economic witnesses. That was the finding that the lower court made. And its finding was that it was probable that some of this money would be spent in ways that alter competitive conditions in the relevant industries. That finding, as I said earlier, is perfectly in accordance with the relevant jurisprudence on competitive standing. Just finally, one factual point, if I may. With respect to the amounts of money that could potentially be distributed, Ms. Davidson's presentation was not entirely correct. I could walk through the details for the court. But our estimation is that there is in excess of $400,000 still available or potentially available for distribution to the North Dakota Wheat Commission absent this litigation. All right. Thank you. Mr. Phillips. This is almost like a second appeal starting right now with you as the appellant and Ms. Davidson as the appellee. Thank you, Your Honor. I guess precisely what this is, although I would hope at some point to get to Judge Ploeger's concern about can we get to the merits of this particular disputed case. Didn't you get your remedy? You went to the WTO. You got the Byrd Amendment repealed. I mean, isn't that what nations are supposed to do? That is one thing. It's a little bit unusual for us to find Canada here before a U.S. court, right? To be sure. But that's precisely, I think, what Congress had in mind when it enacted Section 408 to implement this agreement. What it was saying is, look, it recognizes the WTO is there, NAFTA is there. Those are all available remedies. But 408 remains a significant element of domestic law. But that can be handled by producers in Canada, right? To be sure. But that doesn't mean that it also couldn't. So why do we need to have Canada to resolve this dispute? Well, assuming that you find that the producers have standing. So you're really just kind of a backup is what is going on here, right? Well, I think we have an independent set of interests. Obviously, Canada's concern here is that it entered into an agreement. And as part of that agreement, Congress agreed to change domestic law in a particular way. It did that. It has provided Canada with a jurisdictional hook for coming to court. As we've argued, the Administrative Procedure Act provides Canada with a source of a cause of action. And therefore, we're bringing this action as we would as any other litigant would. Your role as a backup seems to me to become more front and center. As your compatriots fall by the wayside and we quit eating buns. I would encourage you to keep eating buns, although that's not a part of my case. But Judge Reagor, I think the specific point here is that if you had an ordinary third-party beneficiary contract, both the promissory and the third-party beneficiary would be entitled independently to have their rights enforced. And so if it turned out that our colleagues for whatever reason chose not to bring this litigation, Canada still should be entitled to do so. And that's essentially why we're here. And the important element of this to keep in mind is that there is not one word of defense for the decision of the Court of International Trade on the issue of standing. The argument there was that we've elected a particular remedy. And everybody recognizes that that's not an available argument. So then the question is, is there any basis for Canada putting aside that issue to be able to go forward? And here, it's quite clear that it's true. One, Section 408 provides us with a specific remedy. And Massachusetts versus the United States says when Congress provides specific remedies like that,  But there's sovereign entities, and then there's sovereign entities. Now, that case involved the overlap between a state of the United States and the United States federal government that have overlapping environmental responsibilities. This is a little different. You have two totally separate nation states that are part of the nation state system. This is not an ordinary contract. This is a treaty among three nation states. But when the United States modifies its domestic law to recognize particular rights and does so in order to enforce the agreement between Canada and the United States, it seems to me there really isn't any significant difference. So we've, in fact, become a part of the U.S.'s domestic arrangement. And Congress delegated the customs, just as Congress delegated the EPA in the Massachusetts. Why isn't your remedy then to go back to the WTO and say they didn't do what they said they'd do? That is a remedy that's available to us, and we took that remedy. But that's not an exclusive remedy. Congress didn't say that's the only way. If Congress had not enacted 408 and all we had was the contract, we wouldn't be here because, obviously, under 102, we would be dead in the water because we cannot sue directly under the contract. Congress didn't do that. It went to the bottom of passing a specific provision. Mr. Tillich, is there anything you can cite in the legislative history that led to 408 that would support the idea that Congress contemplated the government of Canada separate from Canadian private parties coming into U.S. courts to enforce compliance with the requirements of 408? I don't think there's anything in the legislative history that reflects that. What there is in the legislative history is that Congress is obviously implementing a particular provision of the international court, and that's an agreement between the two parties. Wouldn't it be unusual for Congress to contemplate opening the courts to a foreign government to bring suit against the Customs and Border Patrol people here? And if it is unusual, wouldn't you expect the Congress to specify that's what they wanted to happen here? So that 408 would say, and this can be enforced by the government of Mexico and the government of Canada. I think the background legal principles that would have guided Congress's assessment of this and focused on this particular problem would have been the Administrative Procedure Act, which since at least 1976 has been recognized to allow foreign governments to bring suit to insist that agencies comply with the strictures of the APA, that is, that they don't act contrary to law. And when you add that to the fact that Congress added 408 as a specific provision, to me, that's the key element of this. Is they passed that statute. And maybe they passed it for the producers, but they clearly passed it for us. But the question isn't whether they wanted the provisions of 408 to be complied with. The question is, who gets to enforce 408? Only private parties or also the government of Canada or potentially Mexico? Chief Judge Michel, that's the key. It doesn't say 408 for the private producers. I mean, I think you might have a different argument if it said we provide a private cause of action only for producers in foreign countries. Then I think we'd have a hard time saying, OK, well, we fall within that. There's no specific private cause of action under 408. Congress recognized that if it was going to be enforced, it would be through the Administrative Procedure Act. Now, it may well have assumed in general that producers would have reason to show up at their doorstep. But the reality is the Administrative Procedure Act has long been recognized to allow foreign governments to bring these lawsuits. So to the extent they saw 408 as a bar to what customs might undertake in a particular case and recognized that Canada would have every incentive and right to bring an action to enforce the court with the United States, it would have seen that through the Administrative Procedure Act. And therefore, it seems to me we shouldn't be treated any worse than the private litigants would when Congress hasn't been hinting at a distinguished private from public with respect to how to perform this litigation. And then when you get to 408 and its meaning... Is there some economic harm traceable to the government of Canada if the exactions from the Canadian wheat growers are handed out to the North Dakota Wheat Commission? I don't think... we have certainly not made either a derivative argument from the private entities. No, no, I'm not suggesting a derivative argument. I'm just trying to figure out whether there's some monetary harm suffered by the government of Canada because of what happened as opposed to just a political harm that the U.S. is cheating us because they promised to do X and then they didn't do it. I do call that a political harm. I would call that a significant invasion of this authority. As a legal or political matter, it's huge. But what I'm trying to see is whether there's also a monetary or economic discernible harm suffered by the government of Canada. You didn't make the argument. Are there tax consequences or duties consequences? But that's too tenuous. I think that's... yeah, for us to be able to assert that. Do you really want to stand on the position of a sovereign power being mistreated by another sovereign power and claiming that our Administrative Procedure Act gives you entree to the federal courts to vindicate that standing? Right. I think that is precisely what... I mean, to me, that is the appropriate theory on which we stand here because a lot of great nations, a lot of great people abide by their agreements and provide... and by which Canada is entitled to come to court and have its rights adjudicated. With respect to 408, to get to the merits, I think it's at least worth pausing for two seconds to recognize the United States has abandoned completely any argument with respect to the underlying merits of this case. And I think that reflects its own judgment that if you read this scheme, what Congress clearly understood or would have expected under these circumstances... Well, I'm not sure it's quite fair to say abandoned. You could say they've waived by not arguing, but I'm not sure you can say abandoned. They don't affirmatively say, oh, we concede that on the merits we lose... Had I gotten the opportunity to ask my question of Ms. Davidson rather than answer her question, I would have asked that very question as to why they didn't address the merits because when we get all through with this, God forbid we should find anybody withstanding, we're going to have to talk about the merits probably. And obviously we welcome that because we think there's no question of what 408 is designed to accomplish here. Congress is obviously free to do precisely what it did in the burden amendment or to do as it does subsequently, which is to repeal the burden amendment. But what it cannot do is simply essentially eliminate, and I don't know what they're deciding in Congress at this point, what Customs cannot do is sweep away the protections of the NIA under these circumstances. My trouble with the merits of this case is my question is, and maybe I need to address this with Ms. Davidson at some point, I need to understand a little better how the money that is raised from these countervailing duty and operations, what happens to that money? Is it put in a lockbox that Customs holds and then at the appropriate time when the domestic industry comes in and says, you know, under the statute I get X dollars, they go in the lockbox and they peel off X dollars? Or does that money go into the general treasury, which is what the statute's general accounting for the government seems to call for, in which case I'm wondering why this is a tariff act at all. I'm wondering why it isn't just simply a straightforward appropriations act and that 408 has no relevance to anything. Right, and certainly the other side has made the spending clause kind of an argument. Well, they never do. They make it, and maybe this is something I should address to Mr. Rosenthal if we get that opportunity. They never pull the trigger. The trigger, if you pull the trigger, what's dead is this whole case because if it's an appropriations act, then A, there's no standing on anybody's part, and B, in any event, Congress is free to appropriate or not as it sees fit, independent of any NAFTA or anything else. Isn't that true? Right, but what 408 specifically talks about, right, it's not designed to deal simply with tariffs versus non-tariffs. All it says is that any amendment to Title VII, and it applies to goods. But the question is whether this is an amendment to Title VII at all. No, of course it is. That's precisely what gets amended in the underlying statute. And this applies to goods, right? Of course. And it assesses tariffs on those goods, and those tariffs are put into special funds, and those special funds are allocated based on qualifications that producers have to meet. I mean, we're not talking just about work for the Appropriations Committee once. We put little line items and all sorts of things. But we couldn't do this, could we? We couldn't set all these fancy special funds requirements, applying taxes to goods. That went to the Ways and Means Committee, right? I assume that's exactly right. Exactly. It would have been a jurisdictional issue in Congress, among other things. And so at the end of the day, I mean, I think that's both factually accurate, that they don't do this through the Treasury, so that's why they don't pull that trigger. They recognize factually it's not right. And second, that's not really what the statute is aiming at. This statute is dealing with any amendment has to specifically say either Canada or Mexico or both, just as Congress did with the Uruguayan Round of Implementing Legislation. Congress here, just a few years before this statute was enacted, specifically said this excludes or includes Canada and Mexico. Congress knows what its responsibility is here, and Congress did not intend for these provisions to apply to Canada or Mexico, or at least that's the only inference you can draw from the combination of the background legal principles and the fact that Congress didn't act in this particular case. And that's, frankly, the merits, in a nutshell, and the reason why it seems to be clear that we should win on that basis. I realize it's getting relative. What's the relief that the government of Canada, if it were found to have standing, could reasonably expect to get from the court below? I think we would be satisfied with the same declaratory judgment that our private colleagues have already gotten, because we believe that if we have a declaration that this violates U.S. law, that our good trading partners and friends in the United States will comply with U.S. law and behave accordingly. So you are just a backup? No, if we were here by ourselves, I mean, all I'm saying is I think all we need is a declaratory judgment, because I do believe the United States would comply with that declaration of law. But if they didn't, then we would go and get an injunction, and we would be entitled to an injunction, because, again, the whole point of this is that they are breaching a basic agreement between the two parties. I suppose if you're found to have standing by our court, that then you end up back in front of Judge Pogue, and you could have to be added to his injunction. We could, although, I mean, as a practical matter, I think all, yes, I mean, I think the right answer is vacate and remand on standing, and then Judge Pogue can do remands with us as we go forward,  In view of the fact that the CDSO has been repealed and that most of your clients have disappeared, Well, most of your friends and colleagues have disappeared, so that we're very close to having an entirely moved case if we could only draw this out for a few more years. It seems, is it really, what's really at stake? Is it the $120,000 that Mr. Davidson talks about, or is there a lump, 11 million? What you're looking for is a precedent on which you can go to the government and say, Right, free it all up. Free it all up. Get out of this business altogether. And, obviously, a precedent for the future, that when Congress acts along these lines, that it behaves precisely the way it did when it enacted the Uruguay Brown implementing legislation. That's what we want out of this, and that does, is important. Again, we can go back to the, I agree, the Court of International Trade has to decide what's the remedy for the violation of 408 that we're talking about here and what we need under the circumstances. My guess is we will seek additional relief beyond that, but that's clearly not what we're asking. If you are relying on the promise of the U.S. government to comply with 408 in the future, it sounds almost like you already have the relief that you would want FOB to give you, the declaration that they have to follow 408. Well, to the extent that they, in fact, do that, and do it beyond the specific producers who are still in the litigation, there's no question about that. But again, I think that's a question for the trial judge to sort out on remand. Hopefully it wouldn't take nearly as long as you suggested in a way to move this out. But my hunch is that we could probably resolve this pretty quickly if the court grants us relief to be back in the case and then send it back to the trial court. All right. Thank you, sir. Ms. Davidson, last word to you. Thank you, Your Honor. The trial court's judgment with respect to the Government of Canada's standing was flawed in two very important respects. First of all, for 200 years this nation and for quite a long, but for a very long time, the Government of Canada has resolved government-to-government disputes through diplomacy, international institutions, and international tribunals. Well, I don't understand what you're saying. Since they used to use only other means, somehow that waives an additional means that they say the U.S. law gives them? No, what I'm saying, well, Section 408 does not give Canada any right to sue the United States. Canada relies on the Administrative Procedure Act. I'm saying that it defies any belief that Congress would have changed 200 years of government-to-government dispute resolution without saying a word about it, without defining the word person to include foreign government or even government. Well, his argument, as I understand it, is that the Administrative Procedures Act passed in 1946, interpreted for decades thereafter by courts, has defined person in Sections 701 and 702 to include foreign government. Well, there are two cases which, of course, the Government of Canada only cited in its reply brief, so we were not allowed to respond, but there are two FOIA cases, and that is the whole body of case law that Canada relies on. So in neither of those cases was the plaintiff a foreign government. In one, it was the United States Senate. In the other case, the other case concerns documents obtained by the U.S. government that concern the government of Mexico. So foreign governments were involved in those cases, but in neither of those cases did the court, and those are cases from the 1970s, in neither of those cases did the court address the issue that the Government of Canada raised before the Court of International Trade, but it's an extremely important issue of first impression whether foreign governments may come into United States courts and assert clauses of action challenging United States agency final action under the Administrative Procedure Act. If Canada is correct, its reasoning would not be limited only to our good friends north of the border. There would be no reason to carve out Canada from other nations. So that is a very fundamental flaw in the trial court's decision. The second is the definition of the rule of first impression. Well, what's the flaw? The flaw that it's new and different, it hasn't been done before? That doesn't necessarily mean it's illegal, it just means it's new. And the flaw is that without any indication from Congress that it intended to change the way we resolve our disputes with foreign nations, that suddenly the door would be open for the foreign governments to bring challenges under the Administrative Procedure Act. What Congress did say in the NAFTA Implementation Act and in the Uruguay and the Iran Implementation Act is continuing with our traditions of resolving our government-to-government disputes through international means. And that's why the NAFTA Implementation Act approves the provision in the NAFTA itself that if one of the NAFTA countries thinks that another NAFTA country is not abiding by the NAFTA, which really is Canada's claim here today, then it can ask for a tribunal under Chapter 20 of NAFTA. Well, we all agree to that. And that is the term of the dispute clause under the agreement. Ms. Davison, I can see that the political science community might be agog by discovering that there is now an alternative mechanism for resolving sovereign-to-sovereign disputes in some circumstances.  I remember that something Congress did had perhaps unintended consequences. You've never seen that? We've all seen that. Well, there are some courts that issue decisions without intended consequences also, Your Honor. The trial court here may have done just that. The second mistake that the trial court made was on a less global level, assuming that the term person in the Administrative Procedure Act included foreign governments. Is it clear that it can include foreign humans and foreign corporations? We don't dispute that as long as they can meet the other requirements of cooperation in the United States, including they would have to have minimum contacts in the United States. Sure. And the Canadian producers with their corporations. If any citizen of, let's say, Peru or any business corporation in Peru is entitled under Section 701 and 702 of the APA to sue if the U.S. Customs and Border Patrol people have done something allegedly illegal, and if that's fine with Congress, any corporation, any individual, what would the logic be but not the government? Because we have other means of resolving it. Well, private parties also have other means. They have business arrangements. They compromise and settle disputes all the time. That doesn't mean the courthouse door is necessarily shut. Not necessarily. For example, in this case, the Canadian producers do not have another mechanism to dispute this issue with the United States government. We pretend that they haven't necessarily settled it with the Supreme Court either because they haven't shown actual or imminent injury, but they do not have another mechanism. The government of Canada has at least two other mechanisms. Even if it had five other mechanisms, how does that prove that they're outside the scope of the APA? If any private individual, any association, any union, any corporation from a foreign country has standing but not the government? What's the logic to that? They would have to show that they're within the zone of interest. Of course, of course. For an individual who has been affected by a final agency action and adversely affected, we allow them to sue. Governments we actually treat better than that. We don't resolve our disputes with foreign governments, which are usually political, through our domestic courts. We resolve them through diplomacy, through international institutions. We expect to provide immunity to foreign governments. I think we got that point. Canada can't be sued here. Let me ask you this while we have you before you sit down. What is the government's position on the merits of this case, vis-à-vis either the producers or the Canadian government? Does the government have a position? Yes, I'd be happy to speak to that, and I think I'm the appropriate person to speak to that. We argued the merits below. We thought we were right below. We think the trial court got it wrong. We are not appealing those issues because the Burt Amendment has been repealed. It is as of September of 2007. It doesn't apply to any other duties collected. The last two administrations opposed the Burt Amendment, so we are happy that it was repealed. However, we thought that our arguments below were correct, and we still think they're correct. But those issues, in the government's view, and my colleagues on this side of the room think those issues are very important, but those issues are unimportant to the government compared to the much greater issue of whether foreign sovereigns may sue the United States based upon the APA or whether foreign producers may sue the United States under the APA without showing one scintilla of evidence of harm. Let me ask you this way. If you lose with respect to standing, then we must assume that you're content to have the court's order, as issued below, declaratory relief injunction enforced. You don't really care where the money goes? Is that your position? Well, it would follow the dictates of Congress, and Congress has said to distribute the funds that were collected up through the end of September of 2007. So we would follow the statutory scheme, which directs that we distribute the funds. The fact that the administration wanted the repeal earlier doesn't mean that we won't follow the statutory scheme. But there's an injunction. What are you going to do about that? So you can't follow the statutory scheme? But you didn't say. You didn't bother to tell us you don't think so. We don't think that the court should affirm the injunction. We asked for the court to affirm the dismissal. You can't really argue that if you didn't brief them, right? Your argument ought to be we didn't brief them, period. I was responding to a question. But you have no position on it. Doesn't that mean that you've waived the right to complain about the merits ruling because you, in fact, have only appealed the rulings on standing? That's exactly right. We are not appealing the merits. We are only appealing standing. Just want to be sure. And, of course, we would comply with an order of this court or the court of international treaties if it was the final judgment in the case. But going to go back to the trial court's error in defining the word person, the statutes are replete, starting with 1 U.S.C. Section 1, which defines the word purpose, unless Congress specifically provides otherwise to include certain entities and individuals, and it does not include sovereigns. The law is clear that treaties cannot be enforced as contracts in U.S. courts. The NAFTA is not a treaty. Mr. Shultz isn't purporting to enforce a treaty. He's purporting to enforce a statute, but we certainly will have to look carefully at the case law under 102 and who is or who isn't a person. Congress is very clear not to provide any new causes of action in the NAFTA. All right, well, we thank all counsel who take the appeal under advisement. All rise. The honorable court concerns the full follow-up hearing at 2 o'clock this evening.